**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
————————————————————————

**THOMAS E. DOMBROWSKI,**
                    **Petitioner,**                          **03-CV-0620**

          **v.**

**MICHAEL GIAMBRUNO, Superintendent**
**of the Wyoming Correctional Facility,**
                              **Respondent.**
————————————————————————

## DECISION AND ORDER

          In accordance with 28 U.S.C. § 636(c), the parties have consented to

have the undersigned conduct all further proceedings, including entry of judgment, with

respect to this petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2254.  Dkt. #11.


          Petitioner, represented by counsel, commenced this action seeking a

petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 challenging his

convictions for

> (a)     attempted rape, first degree, in violation of
>          New York Penal Law § § 110.00 and 130.35
>          with respect to an incident in June, 1999;
>
> (b)     sexual abuse, first degree, in violation of New
>          York Penal Law § 130.65(1) with respect to an
>          incident in June, 1999; and
>
> (c)     endangering the welfare of a child, in violation
>          of New York Penal Law § 260.10(1) with
>          respect to conduct occurring in September,
>          1998

following a jury trial before the Hon. James E. Euken, Allegany County Court.  The

-1-

victim was the petitioner's daughter, Brandy, who was aged 16 at the time of the

September, 1998 allegations and 17 at the time of the June, 1999 allegations.

 

Petitioner alleges ineffective assistance of trial counsel due to counsel's

failure to adequately investigate, prepare and present a defense.  Specifically, petitioner

asserts that trial counsel:

(1)    failed to investigate and present evidence with respect to petitioner's medical history;

(2)    failed to interview Brandy's boyfriend, Eric Rogacki, who was residing in the house in September, 1998;

(3)    failed to interview Brandy's school principal, Barbara Funk;

(4)    failed to cross-examine Brandy or present direct evidence that Brandy was neither tardy nor absent from school in September, 1998; and

(5)    failed to cross-examine Brandy with respect to discrepancies between her supporting deposition, grand jury testimony and trial testimony.

Dkt. #1.  For the following reasons, the petition is conditionally granted.

 

## BACKGROUND

On September 23, 1999, Brandy provided a supporting deposition to the

Allegany County Assistant District Attorney in which she affirmed, *inter alia*, that

Beginning in ninth grade my father would come into my room in the morning while I was sleeping.  He would take off my underwear, feel my breasts and butt and attempt to have

> sex with me.  I always would try to fight him off, yelling, pushing and trying to move out of his reach.  He would lay on top of me, rub himself on me and say "You know you want it, you know you'll love it." . . .
>
> My father continued to come into my room in the morning, even after we moved to Rushford.  He continued to forcibly take off my underwear, lay on top of me, rubbing himself on top of me and telling me I wanted sex with him.  I continued to fight him off.  This occurred on a regular basis with the last time being in the first two weeks of June 1999.  On that date my father came into my room, forcibly removed my underwear, rubbed my breasts and buttocks, laid on top of me and tried to force me to have sex with him.

Exhibit O.

Before the grand jury, Brandy provided testimony with respect to two distinct time periods: September, 1998 and June, 1999.  Exh. O.  With respect to September, 1998, her junior year of high school, Brandy testified that:

> A    My dad would always hit me and try to get me to have sex with him.
>
>             * * *
>
> Q    Okay, and where would he come sometimes to do that?
>
> A    My bedroom.
>
> Q    And when would that be?
>
> A    In the mornings.
>
> Q    So he'd come into your bedroom in the morning?
>
> A    Yes.
>
> Q    And what were you doing then when he came into your bedroom?
>
> A    Just waking up to get ready for school.

Q        And what did you usually have on when you were
         sleeping?

A        My pajamas and a pair of underwear.

Q        And when he came into your room, we're talking
         again now about the beginning of your junior year,
         September of 1998.  Did he ever come into your room
         then in the mornings?

A        I want to say yes . . .

Q        Let me ask you this.  How often would this occur from
         the time you moved to Rushford in June of 1997 until
         June of 1999, about how often would this kind of
         behavior occur?

A        Every day.

Q        So in September of 1998 it would have occurred?

A        Yes.

Q        So sometime in September of 1998 when you were
         starting your junior year did he ever come into your
         bedroom?

A        Yes.

Q        And when he did what would he do?

A        He would touch me.

Q        And –

A        He would lay on top of me.

Q        And you said you had pajamas and underwear on, did
         he do anything with those things?

A        He would take 'em off in the mornings.

Q        Your pajamas and your underwear?

A        Just my underwear.

-4-

Q       Okay, and how did he do that?

A       Like I'm a sound sleeper, so he would just take my underwear off.

Q       And what woke you up?

A       When he was laying on top of me.

Q       So he took your underwear off while you were sleeping and then once he laid on top of you you woke up.

A       Yes.

Q       And when he laid on top of you what would he have on?

A       Sometimes he'd have his underwear on.

Q       And what else?

A       That's it.

Q       You said sometimes he'd have his underwear on, what about other times?

A       He would be naked.

* * *

Q       When he did that what did he do to you?

A       He would tell me that he wants me to have sex with him and that I want it and I would love it.

* * *

Q       What did you say to him?

A       To get off me and leave me alone.

Q       When you were saying that what were you doing?

A       Trying to push him off me.

* * *

Q      Okay.  So he was doing that all the way back . . .
        when you first moved there in June of '97?

A      Um-hm.

Q      He was still doing it in September of '98?

A      Um-hm.

Q      And it was happening you said how often?

A      Every day.

Exh. O, pp.14-19.

With respect to the June, 1999 charges, petitioner testified before the

grand jury as follows:

Q      Now let's talk about did there come a time when you
        moved out of the house?

A      Yes.

Q      And when was that?

A      June 13th.

Q      Of what year?

A      . . . 1999.

* * *

Q      . . . Can you recall if during the couple of weeks
        before you moved out of the house, during that period
        from the beginning of June until you moved out on
        June 13th whether your father ever came into your
        room?  On any of those days?

A      One morning before I went to school.

Q      And what happened?

A      He tried to have sex with me again.

Q      And tell me about it, about what time was that?

* * *

A      About 6:30, quarter to 7.

* * *

Q      And you were where?

A      In my bedroom.

Q      Okay, and where in your bedroom were you?

A      Standing near my dresser.

Q      And on that day did he do anything to try to have sex with you?

A      No, he smacked me across my face and then threw me on my bed.

* * *

Q      When he threw you on your bed what did he do?

A      He said he wanted to have sex with me.

Q      What did he have on?

A      His clothing, pair of pants, that's it, just jeans.

Q      And did he try to lay on top of you or anything like that?

A      He pushed me down on my chest.  Well, up here, and I was screaming and then Gloria came up, but she didn't do anything, she told me to get ready for school.

Q      And so he pushed you down on your bed and was holding you down.

-7-

A       Yeah.

* * *

Q       Okay. And were you dressed at that time or did you have pajamas on?

A       No, I still had my pajamas on.

* * *

Q       You said he slapped you across the face, why did he do that?

* * *

A       He came in my room and I told him to get out because I knew what he was going to say and he slapped me.  He said he was horny and he wanted to have sex and he slapped me.  He threw me on my bed and grabbed me up here and held me down and said he wanted to have sex.

Q       And that's when you screamed and Gloria came in.

A       Yes.

Exh. O, pp.19-23.


The petitioner was indicted on three counts:

1.   attempted rape in the first degree in violation of New York Penal Law § 130.35(1) & 110.00 for attempting to have forcible sexual intercourse with Brandy on an unknown date in June, 1999, "by forcibly removing her underwear, then while his penis was exposed forcibly laid on top of her, trying to have intercourse forcibly while Brandy . . . fought to avoid his penetration;"

2.   sexual abuse in the first degree in violation of New York Penal Law § 130.65(1) for forcibly removing Brandy's underwear and forcibly rubbing her vaginal and breast areas while she attempted to push him off her on an unknown date in June, 1999; and

3.   endangering the welfare of a child in violation of New
York Penal Law § 260.10(1) by forcibly rubbing Brandy's
breast and vaginal area on an unknown date in
September, 1998.

Exh. O.   The People moved to permit Brandy to refer to a continuing course of conduct

to explain the reasons for her inability to remember specific dates and surrounding

circumstances of the offenses charged in the indictment and to show why she did not

immediately reveal the alleged abuse.   In a Decision and Order entered May 23, 2000,

Judge Euken declined "to allow this seventeen year old special education student to

testify [to] a continuing course of sexual, physical and verbal abuse by her father during

the period 1997 to 1999 or for the prosecution to refer to this in its opening statement."


**Trial**

At trial, the prosecution presented Brandy as an intellectually challenged

individual lacking motive to fabricate accusations against her father.   Exh. R, p.33.

Specifically, the prosecution noted that Brandy did not reveal the abuse until weeks

after her boyfriend, James Hennard, had arranged for Brandy to live with his friend's

mother, Glenda Stocking.   Exh. R, pp.28-33.   The prosecution also argued that there

was no reason for Brandy to fabricate the allegations because

Brandy was old enough to move out on her own without any
legal consequences.   She couldn't be brought back by
Family Court.   She couldn't be brought back by the police.
So she could have moved out without saying anything,
without subjecting herself to the police and the Grand Jury
and the court system and all of the time that she had to
appear, as I said you'll see, in a place that made her fearful.

Exh. R, p.34.   The prosecution also asserted that Brandy

> didn't do this manipulation to go and live with her boyfriend, because even after she moved out of the house she moved into a family setting, a family with supervision, not in with her boyfriend.  She moved in with Glenda Stocking, and Glenda helped take care of her . . . she didn't do it to quit school. She went back in September of the next year.  She went through the whole school year.  She didn't drop out.  She didn't have bad attendance.  She graduated in June of this year, June of 2000. . . . Now, she got an. . .  IEP diploma, an individual education diploma . . .

Exh. R, pp.34-35.

Petitioner's trial counsel commenced his opening statement by highlighting that ever since May, 1995, when petitioner obtained custody of Brandy from her mother, Laurie Howard, Child Protective Services would come to the house on a regular basis.  Exh. R, pp.40-41.  Petitioner's trial counsel argued that Laurie Howard filed numerous petitions attempting to regain custody, stating:

> In fact, there was a petition filed in February of '99 which as you can recall as only about four months prior to June of '99. And this petition said we want custody.  The petition was denied. . . . Then we have prom night, May 8, 1999, Cuba-Rushford prom night. . . . [Brandy] went with James Hennard to the prom.  No problems.  She was given a deadline, certain hours you can go to the prom . . . .She was home on time.  No problems.  Then on May 27, '99 there was a petition filed by grandmother, Laurie's mother, asking for custody of Bandy.  On June 13th or 14th of 1999 there were some words spoken between Gloria Schenback and Brandy . . . .  The next morning she went to work and did not return.

Exh. R, p.45.  Petitioner's trial counsel then posited his theory that Brandy left home so as to be able to avoid petitioner's refusal to allow her to attend certain events with her boyfriend:

> Now, James Hennard graduated from Cuba-Rushford School on June 26, '99.  Now, my client and his girlfriend

> said to Brandy, "You can't go to the graduation and you can't
> go to the graduation party."  So, she didn't go to the
> graduation on June 26th, nor did she go to Mr. Hennard's
> party.  Now, in Cuba they have a party on the hill.  And they
> had a party on the hill on July 3, 1999.  Party on the hill in
> Cuba means that all those recent graduates from high
> school plus some from the previous year get together and
> they have some beer and what have you at the party.  My
> client said to Brandy, "You can't go to the party on the hill . .
> . ."  Now, remember that you've already been told and the
> testimony will reveal that she left home on June 14th.  Well, if
> you want to go to a party you got to leave home first,
> because dad is going to tell you and mom is going to tell you
> you can't go to the party.  So, she left home on June 14th.

Exh. R, pp.45-50.  Petitioner's trial counsel then informed the jury that the proof would

demonstrate that petitioner could not have committed the crimes Brandy accused him

of because petitioner

> does not get up early in the morning.  He is not a morning
> person.  He is a night person. . . . In 1997 he had a terrific
> automobile accident, as a result of that accident, [he] went
> through a series of operations.  The last of the operations I
> believe was in April or May of 1999, and as a result of that
> operation and the pain that he suffers, he has erectile
> dysfunction.  You've seen it advertised on television.  His is
> not caused by something psychological, it's caused by
> organic reasons, physical reasons.  In other words, so he
> couldn't even rise to the occasion in June of '99, and you are
> going to hear testimony about that from Gloria and from
> [petitioner]. . . . And I would suggest to you that there is – I
> can't get into it, but I would suggest to you right now that
> there is going to be a failure of proof on the People's part.  It
> has nothing to do with Brandy being developmentally
> disabled.  It has nothing to do with that.

Exh. R, pp.53-55.


**Brandy** testified that in September of 1998, petitioner would come into her

bedroom in the mornings and touch her breasts, butt and vagina with his hands.  Exh.

R, p.73.  Specifically, Brandy testified that petitioner would come to her bed, sometimes

while she was sleeping, and

> A   . . . He would sometimes lay down on me and sometimes
> would stand up.
>
> Q   Okay. . . . You said you had your pajamas on.  Was there
> anything but your pajamas?
>
> A   My underwear.
>
> Q   What about it?
>
> A   I had them on.
>
> Q   Okay.  And when your father came in the room, was
> there anything about your pajamas?
>
> A   I don't understand.
>
> Q   Did you keep them on?
>
> A   Yes.
>
> Q   Okay.  And so, when he touched you, was it on top of
> your pajamas or underneath them.
>
> A   Sometimes it would be underneath my pajamas and
> sometimes he would touch me, but most of the time he
> would try and touch my parts . . . under my pajamas.
>
> Q   Under your pajamas.  And did you do anything when he
> did that? Did you say anything?
>
> A   I would ask him to stop.
>
> Q   When you say you asked him to stop, how did you ask
> him?  Did you say anything?
>
> A   I would yell at him, tell him to knock it off or try pushing
> him off of me.
>
> Q   And when you did that, did he stop?
>
> A   No.

Q   Okay.  And weren't there other people in the house?

A   Yes.

Q   Who was in the house?

A   Gloria or Jason.

Q   Okay.  And did anyone come up to check on you?

A   No.

\* \* \*

Q   Okay.  And so, at what point during the morning, I mean how long did it go on for in the morning, in one morning?

A   Almost an hour.

Q   Okay.  So, it was a long time?

A   Yeah.

Q   Were these on school days or non-school days?

A   School days.

Q   Okay.  So, did you have to get up and get ready for school?

A   Yes.

Q   Were you able to do that?

A   No.

Q   Okay.  Did you make it to school on those days?

A   Yes.

Q   Did you make it on time?

A   Sometimes I would miss the bus.

Q   Sometimes you would miss the bus?

A   Yes.

Q   And if you missed the bus, how did you get to school?

A   I would stay home.

Q   Okay.  If you missed the bus, you would stay home.

Exh. R, pp. 73-78.

With respect to June, 1999, Brandy testified that:

A   My dad was sexually abusing me.

Q   Okay.  And could you tell me about a specific time, what room did he come into?

A   My bedroom.

Q   Okay.  And what were you wearing?

A   Pajamas.

Q   Okay.  And so what time of day was it?

A   Morning.

Q   Okay.  And when he came into the bedroom, did you say anything?

A   I told him to get out of my room.

Q   Okay.  Why did you tell him to get out of your room?

A   Because I knew what he was going to say.

Q   Okay.  And what did he say?

A   He told me that he was horny and that he wanted to have sex with me.

Q   Okay.  And what did you say?

A   I told him no.

Q   All right.  And did he take no for an answer?

A   No.

Q   What did he do?

A   He slapped me across my face and threw me on my bed.

Q   He slapped you across the face and did what?

A   Through [sic] me on my bed.

Q   Okay.  And when he threw you on the bed, what did he do then?

A   He got on top of me and started touching me?

Q   Okay.  Where was he touching you?

A   On my body.

Q   Okay.  What parts of your body?

A   On my breasts and my vagina.

Q   Okay.  And what was he wearing at that time?

A   Pants.

Q   Okay.  Did he have anything else but pants on?

A   No.  Just pants.

Q   Okay.  And was he saying anything to you?

A   He told me that he wanted to have sex with me, and I told him no, and then he said that I would like it.

* * *

Q   So, what did you do?

A   I told him to get off – to get away from me.

* * *

Q   And did he do that?

A   No.

Q   What did he do instead?

* * *

A   . . . He took off my pajamas.

Q   Okay.  And then what did he do?

A   He tried having sex with me and I pushed him off of me.

Q   Okay.  When you say he tried having sex with you, did he ever take his pants off?

A   No.

Q   Okay.  So, what was he doing?

A   He was rubbing against me.

Q   Rubbing against you?  Okay.  And when you say rubbing against you, what position were you in?

A   Laying down.

Q   Okay. On what?

A   My bed.

Q   Okay.  What position was he in?

A   He was laying on top of me.

* * *

Q   And so what happened?

A   I tried moving to hit the wall so I could get up.

Q   And were you able to do that eventually?

A   Yes.

Q   And then did he let you up?

A   I got out of my room.

Q   Okay.  And where did you go?

A   Downstairs.

Q   Okay.  And what did you have on when you ran
    downstairs?

A   Nothing.

Q   Okay.  Was anyone down there?

A   No.

Q   Okay.  Where was Jason at the time?

A   I don't know.  I think he was outside.

Q   How about Gloria?  Do you know where she was?

A   No.

Q   But nobody was in the house?

A   No.

Exh. R, pp. 82-86.


        Brandy also testified that she left home on June 13, 1999 and that her

boyfriend, James Hennard arranged for her to move into Glenda Stocking's home on

June 14th.  Exh. R, p.89.  She denied having asked her father's permission to attend

James' graduation, stating that he graduated June 24th, after she was out of the house.

Exh. R, p.106.  She also denied discussing the party on the hill with her father.  Exh. R,

p.106.  Brandy continued to reside with Glenda until she accidentally burned the house

down cooking french fries, at which time she chose to move in with James' parents.

Exh. R, pp.98-99.  During that time period, Glenda supervised her and Brandy complied with Glenda's directions.  Exh. R, pp.100-01.  Brandy graduated from high school with an IEP diploma.  Exh. R, p.98.

On cross-examination, petitioner's trial counsel confirmed that in September, 1998, petitioner, Gloria and Jason were residing in the home.  Exh. R, pp.149-50.  He asked if there were other people in the house, to which Brandy responded, "I don't think so."  Exh. R, p.150.  He later had Brandy confirm that Gloria's son, Jason, was the only other male in the household.  Exh. R, p.176.  With respect to the June, 1999 incident, petitioner's trial counsel asked Brandy if Gloria was up, to which Brandy responded, "I don't know if anybody was up."  Exh. R, p.155.  Petitioner's trial counsel then provided Brandy with  her grand jury testimony and questioned her as follows:

> Q   On January 12, 2000, in making reference to the June 13th incident, were you asked the question about when you screamed and Gloria came in.  Do you remember that [sic] asking that question?
>
> A   Yes.
>
> Q   And was Gloria there?
>
> A   She came in the bedroom and told me to get dressed.
>
> Q   And was that the June 13th?
>
> A   Yes.
>
> Q   Did you tell us that just a few minutes ago?
>
> A   No.  I didn't.

Q   Does this refresh your recollection?

A   Yes, it does.

Exh. R, pp.173-74.  Petitioner's trial counsel then elicited a litany of degrading names

Brandy alleged that petitioner called her.  Exh. R, pp.174-75.

Brandy's younger sister, **Lee Ann**, testified that she lived in petitioner's

home for about one year, beginning in the summer of 1998.  Exh. R, p.214.  During that

time period, she testified that petitioner was mentally and physically abusive to Brandy.

Exh. R, p.215.  She also testified that her father

> always walked up to Brandy's room, like I could hear him
> hitting her and stuff, but one day I followed him up the stairs
> because I always wanted to see what was happening and . .
> . it was about two minutes after he was up there, and he was
> just walking out and his pants were unzipped.

Exh. R, pp. 218, 222.  Lee Ann also testified that she ran away the day that Brandy

moved out of the house, but was forced to go back by a Judge.  Exh. R, p.221.  On

cross-examination, petitioner's trial counsel elicited that Lee Ann ultimately left the

house to enter a psychiatric hospital.  Exh. R, p.229.  He also elicited derogatory terms

petitioner used to address Brandy and testimony that petitioner threw hay bales at

Brandy.  Exh. R, p.230, 233.

**Glenda Stocking** testified that her son's friend, James Hennard, asked

her if his girlfriend, Brandy, could stay with her because she was having some problems

at home.  Exh. S, p.16.  Although she had never met Brandy, she agreed.  Exh. S, p.17.

Ms. Stocking testified that Brandy slept on the couch or in the camper.  Exh. S, p.18.

She testified that Brandy "came to be part of our family" and after about a month began to talk to her about the problems in her home.  Exh. S, p.19.  It was Ms. Stocking who suggested that Brandy seek counseling through Accord, which was a mandated reporter of abuse.  Exh. S, p.21-22.  Accord also suggested an order of protection against petitioner and Gloria.  Exh. S, p.22.  Ms. Stocking applied for guardianship of Brandy so that she could attend school.  Exh. S, p.22.  Ms. Stocking testified that Brandy abided by curfew and presented no problems.  Exh. S, pp.27-28.

**James Hennard** testified that he began to date Brandy on March 3, 1999. Exh. S, p.37.  He first suggested that Brandy leave petitioner's home in May, 1999. Exh. S, p.41.  Towards the end of the school year, near exam time, Mr. Hennard drove Brandy to Ms. Stocking's home where he had arranged for her to stay.  Exh. S, pp.44-45.   On cross examination, Mr. Hennard testified that on May 29, 1999, Senior Skip Day, petitioner told Brandy that she was no longer allowed to see him. Exh. S, p.79.  In the beginning of June, Mr. Hennard gave Brandy a letter in which he told her to leave petitioner's home.  Exh. S, p.77.  Mr. Hennard agreed that he gave Brandy an ultimatum that he would not continue to go out with her unless she left petitioner's home.  Exh. S, p. 59.

**Gloria Schenback** testified as to the layout of the home she shared with petitioner, Brandy and her son, Jason, and narrated a videotape she took of the home as it was shown to the jury.  Exh. S, pp.111-22.  Ms. Schenback testified that Brandy was the first person out of bed in the morning and that petitioner did not usually arise

until after the children had left for school.  Exh. S, pp.135-36, 139.  Ms. Schenback testified that she was certain the petitioner did not get up before her in the morning during the first thirteen days of June because petitioner was taking medicine for pain and to assist his sleeping.  Exh. S, pp.174-75.

Ms. Schenback testified that although Brandy was given permission to attend the prom with James Hennard and was home by curfew, she and petitioner later discovered that Mr. Hennard had driven Brandy in an unregistered car with the license plate from his mother's car.  Exh. S, pp.147-48.  As a result, petitioner forbid Brandy from seeing Mr. Hennard.  Exh. S, p.148-49.  On the morning of May 28, 1999, Ms. Schenback testified that she received a telephone call from school indicating that Brandy was not in school.  Exh. S, p.157.  At almost midnight, petitioner and Ms. Schenback located Brandy at the home of her girlfriend, Stacy, and drove her home. Exh. S, p.158.  On June 14, 1999, Brandy did not come home from school, and Ms. Schenback discovered that Mr. Hennard had picked her up from school.  Exh. S, p.163.

Petitioner's trial counsel questioned Ms. Schenback about prior investigations by Child Protective Services, eliciting testimony that there had been approximately a dozen investigations over the years, but only this charge.  Exh. S, pp.170-71.  Ms. Schenback also testified that petitioner suffers from erectile dysfunction following an automobile accident in July, 1997 and that although he underwent an operation on April 13, 1999 to fuse a herniated disk, that did not improve his condition. Exh. S, 175-76.

Petitioner's trial counsel called **Jessica Sullivan**, who testified that she would catch the bus at Brandy's house at approximately 7:10 a.m. and would sometimes go into the petitioner's home before the bus arrived where she would observe petitioner downstairs "most of the time." Exh. S, pp. 252, 254-55.

**Petitioner** testified that over the years, approximately 20 social workers have come to his home to interview him and his wife and children.  Exh. T, p.12. Petitioner also testified that in February, 1999, Family Court Judge Nenno told Brandy that "she was at the age where she could do as she damn well pleased."  Exh. T, p.27.

In June, 1997, petitioner testified that he was in an automobile accident, and attempted to explain his medical condition, medication and medical procedures, including the disc fusion on April 13, 1999.  Exh. T, pp.14-15, 16.  Petitioner testified that he normally awoke about 9:00, although he also stated that he would often wake up from the noise of the kids getting ready for school.  Exh. T, pp.21-23.  Petitioner denied touching Brandy inappropriately in September, 1998.  Exh. T, p.24.  Petitioner denied calling Brandy many of the names previously put before the jury.  Exh. T, pp.35-36, 70.  He also denied ever attempting to have sexual intercourse with Brandy or touching her inappropriately.  Exh. T, p.44.

Petitioner testified that he gave Brandy permission to attend the prom with James Hennard; that Brandy was home by curfew; but that he later learned that James had driven Brandy in an unregistered vehicle.  Exh. T, p.33.  As a result, James Hennard was no longer welcome in the residence.  Exh. T, p.34-35.

**Jason Rosenthal**, Gloria Schenback's son, testified that Brandy would wake him up for school at about 7:00.  Exh. T, p.90.  Jason testified that he filed charges against James Hennard following an altercation at a football game.  Exh. T, pp.104-05.  Jason also testified that the supporting deposition filed by Brandy shortly thereafter also included allegations against him.  Exh. T, p.105.

A witness from **Child Protective Services** explained the process of investigating reports of abuse.  Exh. T, pp. 112-127.

In summation, petitioner's trial counsel argued that

> there is something that's not in this case and it's something which they have tried to put into this case.  We're not here . . . making a judgment about the IEP program.  We're not here making a judgement about disabilities, developmental disabilities or anything. . . . Now, that was stated in the opening statement that Brandy does have a developmental, educational developmental disability.  You've heard no evidence of that, and there is nobody who has taken the stand and has said that, but assuming that that's true, we're not here . . . determining whether she was . . . developmentally disabled.  That's not in this case.  It's not here.  We're not here determining that, and we're also not here determining whether [petitioner] was a good parent or a bad parent. . . . You are also not here to determine whether or not [petitioner] is hurt or was hurt because he's the only person who said he was.  That's not in this case.  Bias and sympathy play no part.  Bias and sympathy for the alleged victim play no part in this case.  Don't fall for it.  Don't fall for the feely touchy everybody hugging each other, because bias and sympathy don't play a part in this case.

> \* \* \*

> There are two ways of creating reasonable doubt. . . . You can find reasonable doubt from the evidence produced or you can find reasonable doubt from the lack of evidence. . . .

Now, if you want to, we can sort through the box that says evidence in this matter, and I open the box and the box says that Brandy testified. She certainly did testify and we've heard a lot about her educational disabilities. Assuming that's true, does that mean that she cannot be conniving and manipulative and lie? No, it doesn't mean that. I have seen no studies which indicate that persons on IEP cannot lie, cannot manipulate, cannot be conniving. . . . We have to scrutinize her testimony, and her testimony is that she went to live with dad. . . . Then after that, we're aware that various other petitions or files were for custody and visitation. All of those petitions – and you heard [petitioner], he said there was [sic] about 15 to 20 of them – are all resolved in [petitioner's] favor. He continues to have custody. . . . Now, in February of '99 . . . Judge Nenno said goodbye, good luck, you can do what you want. Nobody has contradicted that. Judge Nenno told Brandy . . . have a good life. You can live here or you can live there. You can do what you want. . . . She didn't have to stay there. She could have gone to wherever the mother resided. . . . after [petitioner] gets custody . . . some ten or 15 petitions are filed, all of them are thrown out, all of them are dismissed. No change of custody. And we do know that child protective service workers spoke with Brandy . . . on numerous occasions. . . . And of all of these Child Protective complaints, not one – not one – resulted in the filing of a proceeding against [petitioner] to get the child away from [petitioner] and to put the child either in foster care or with Laurie Howard. Not one. . . . And this agenda Laurie Howard was determined, for whatever purpose good or evil, to get back Brandy . . . . She filed petitions. It got nowhere. Well, if you go to the filed petitions and they get no where, what do you do? Well, you start filing child abuse complaints, start calling Child Protective Services, call the hotline. . . .

Exh. U, pp.9-25. With respect to the June, 1999 incident, petitioner's trial counsel

argued that

Kind of unusual to have rape with your pants on. I suppose in theory it's possible, although I usually like to take my pants off when I have sex, but maybe its possible. Maybe it's a new way of doing sex. This is a man at that time who weighed 299 pounds, according to his testimony. . . . Now you saw Brandy. . . . she's a very delicate child. She's not very heavy. . . . But can you imagine a 299 pound man on

-24-

that person?  And she says that she maneuvers herself out from under.  Try that some day.  Try having a 299 pound person on top of you and maneuver yourself out from under him.  Can't be done. . . . Well let's see if there is another agenda here. . . . What other reason could Brandy have to say those things?  Well, let's see . . . . She gets a letter from her boyfriend, which James Hennard admitted, and it says my way or the highway. . . . It was in effect an ultimatum. . . . Now, we can argue why the ultimatum was given, but I would suggest to you that the performance that allegedly took place on June 13th or 14th didn't take place.  It was a pretext to get out of there for whatever reasons.  It was a pretext to fulfill an agenda, an agenda of Mr. Hennard's.  You've heard, certainly have heard testimony that Brandy can be easily led . . . . There has been no proof of that, no expert testimony of that, from any expert or person presenting to be an expert.  But it's a private agenda, an agenda not of Brandy's but of Mr. Hennard's. . . . mom and dad . . . refuse to allow him to go with their daughter.  So, what do you do?  Well, you can't take out the person you think you are in love with . . . . So what do you do?  Well, you sit down and you write a note.  And the note says either you leave the [petitioner's] household or you get on the highway . . . . You get out of that house, you leave, and you . . . go someplace else, because I want to see you, I want to be with you. . . . So, the child goes to Stacy . . . but the [petitioner finds] out where Brandy is, and they go and they pick her up.  So now they know that just going to Stacy . . . or another friend's house is not going to work. . . . My God what are we going to do to be together?  Well, let's think a minute here. . . . If you say that he's sexually abused you, that could be a way to get out of the household. . . . And I construct this story that dad attempted to have sex with me.  And then they won't come and get me. . . . And I'll file it in the Family Court and they'll tell him not to bother me.  And low and behold they come to Family Court and . . . [petitioner] stipulates, agrees to an order of protection.

Exh. U, pp. 30-37.

In her summation, the prosecutor noted that Brandy waited more than a month before she began to speak of sexual abuse to Glenda Stocking, questioning:

> if James wanted Brandy to concoct a story, would you think
> they would have told it right away after she ran away. . . . in
> July Glenda knew about the sexual abuse, they decided not
> to go to the police.  Now, when did they decide to go to the
> authorities?  School was coming . . . . School meant that
> Gloria Schenback and the [petitioner] could come there and
> she would be there without the protection of Glenda
> Stocking.  She would be in a place where they had come
> and gotten her before. . . . She didn't want to go to school
> because she was afraid.

Exh. U, pp. 78-80.  In addition, the prosecution emphasized that the petitioner's own

witness, Jessica Sullivan, testified that petitioner was often up at 7:00 in the morning

when she would come to the house before catching the school bus.  Exh. U, p.72.

Finally, the prosecution argued that

> The last thing that they said to prove that it couldn't have
> happened was that the [petitioner] has erectile dysfunction.
> They didn't present any medical proof of that.

Exh U, p.75.   The jury convicted the petitioner on all counts.  Exh. U, pp.146-47.


**Motion to Vacate**

Petitioner moved to vacate the conviction, pursuant to New York Criminal

Procedure Law § 440.10, on the grounds of, *inter alia*, ineffective assistance of trial

counsel.  Exh. P.  Specifically, petitioner argued that trial counsel inexplicably failed to

present evidence regarding serious personal injuries sustained by petitioner in an

automobile accident in June, 1997; failed to call disinterested witnesses, *to wit*, Eric

Rogacki and Barbara Funk; and failed to cross-examine Brandy regarding

inconsistencies between her supporting deposition, grand jury testimony and trial

testimony.  Exh. P.  In support of his motion, petitioner proffered the following:

Affidavit of petitioner averring that his trial counsel informed him that the

trial court had precluded any mention of any allegations of abuse prior to June, 1999.[1]

Petitioner also averred that even though he had provided trial counsel with information

about serious physical injuries sustained as a result of a motor vehicle accident on June

27, 1997, trial counsel failed to consult with any of his medical providers or present

information to the jury regarding petitioner's physical limitations.  Exh. B.


Affidavit of Eric Rogacki  averring that he resided at petitioner's home

from September 8, 1998 until December, 1998 and that

> From almost the time moved in, BRANDY would get up at
> about 6:00 AM. and come downstairs to where I slept on the
> couch in the living room, usually in her pajamas or boxer
> shorts and a T-shirt.  She would usually have to wake me
> up.  She was generally in a good mood as far as I could tell.
> Most mornings, we would spend time kissing and petting.
> The rest of the family was still upstairs. . . . BRANDY was
> always the first one up as far as I could tell.

Exh. D.  Mr. Rogacki denied seeing or hearing anything to indicate that Brandy was

upset or injured during this time period.  Exh. D.  Mr. Rogacki recalled that Brandy and

other members of the household were usually up and about before petitioner in the

_____

[1] Mr. Bulson sent petitioner a letter, dated May 30, 2000, in which he enclosed Judge
Euken's Decision and Order of May 23, 2000 and informed petitioner that:
> We were quite successful in our recent efforts in court.
> Specifically, the Court has indicated that they will not allow the
> prosecution to refer to a continuing course of conduct in their
> opening statement or to a continuing course of sexual, physical
> and verbal abuse during the period of time from 1997 to 1999.
> Thus, they will not be allowed to present evidence as to any
> abuse during the period of time from 97-99.  Obviously, they
> cannot go before 1997.  This is a very helpful decision to our
> position and precludes the jury from hearing any of that garbage
> she was trying to present.

mornings, and remembered that petitioner often looked as though he were in pain and had difficulty getting around and using his arms.  Exh. D.  Mr. Rogacki averred that trial counsel contacted him after petitioner's conviction and asked him if he had lived with petitioner's family in 1999, but did not ask him anything about 1998.  Exh. D.

Affidavit of Barbara Funk, Brandy's high school principal, averring that trial counsel never contacted her, but that she would have been available to testify, *inter alia*, that Brandy was neither absent nor tardy to school on any day in September, 1998. Exh. E & O.

Affidavits of numerous medical providers, with attached medical records, indicating that following an automobile accident on June 27, 1997, petitioner was diagnosed with a disc herniation at C5-6 and a disc protrusion and spondylolisthesis at L4-5.  Exh. G-N.  The medical records document consistent complaints of significant, continuous pain as well as numbness in petitioner's extremities, bladder incontinence and depression.  Nerve conduction studies documented cervical radiculopathy and physical therapy documented significant limitations in lumbar and cervical mobility.  On September 24, 1998, neurologist James J. Teter, M.D., documented "resistance to passive range of motion in the cervical region in all directions, but particularly bending laterally toward the right side" as well as "diminished perception of pinprick in the palmar surface of the third and the radial half of the fourth finger of the right hand;" and a Tinel's sign upon striking the  volar surface of the left, but not the right wrist.  Exh. I. Dr. Teter referred petitioner to neurosurgeon James G. Egnatchik, M.D., who performed

an anterior cervical micro discectomy with fusion at C5-6 on April 13, 1999, requiring

him to wear a rigid cervical collar until May 15, 1999.   Exh. K.   Following a post-

operative exam on August 26, 1999, Dr. Egnatchik noted that petitioner

> is doing quite well with respect to his neck rehabilitation
> except for the past three weeks when he began having
> severe low back and lower extremity pain.  This increased
> his neck spasm and headaches.  He is quite disgusted with
> his quality of life at this time.  He states his pain radiates
> across the low back, down the right lower extremity with
> numbness and tingling which radiates down both
> extremities.

Exh. K.  As a result, Dr. Egnatchik recommended a lumbar MRI scan.  Exh. K.  Dr.

Egnatchik's examination noted "a considerable amount of muscle spasm in the strap

muscles of the neck."  Exh. K.   Petitioner's chiropractor, neurologist, pain management

specialist, neurosurgeon and physical therapists each affirmed that petitioner's trial

counsel did not consult with them regarding petitioner's medical condition.  Exh. H-M.

The Social Security Administration, by decision dated June 6, 2000, determined that

petitioner had been disabled since August 26, 1998.  Exh. O.


> Judge Euken denied the motion to vacate, stating:

> It is only speculative that calling a medical expert to describe
> [petitioner's] injuries would have been a better use of the
> available medical evidence.  [petitioner] and Gloria . . . both
> testified to [petitioner's] injuries.  They also testified that
> [petitioner] was unable to have or maintain an erection and
> the couple did not have sexual relations since June of 1997.
> Gloria . . . testified to [petitioner]'s operation on April 13,
> 1999, for a herniated disk that caused him pain. [petitioner]
> testified to being in pain and stated that lower back problem
> might put him in a wheelchair in a few years.  There was
> nothing in the medical records showing that [petitioner] was
> in such pain that he could not have attempted the rape or
> committed the crimes.

The critical issue in the case for the jury to resolve was whether [petitioner]'s seventeen year old daughter was telling the truth.  An erectile dysfunction would not preclude conviction for attempted rape.  A person with a low back injury and in pain could commit rape.  [petitioner] took the stand in his own defense and denied the charges.  His attorney conducted a vigorous defense attacking the credibility of his client's accuser.  His attorney showed that [Brandy] was upset at her father for forbidding her to see her boyfriend.  He showed that her boyfriend encouraged her to run away from home so she could be with him.  Her boyfriend even arranged for a place for her to live which she had the right to do so since she was seventeen years of age.

The defense showed that Jason Rosenthal who resided in the Dombrowski home filed a criminal charge against Brandy Dombrowski's boyfriend.  It was at this point in time that Ms. Dombrowski made a statement against her father.  The defense argued that the evidence in the case showed her to be conniving and manipulative.

[petitioner] alleges that his attorney failed to call disinterested witnesses, but the record demonstrates that the defense called the residents of the household where the alleged crimes took place: the [petitioner]; Gloria . . .; Jason Rosenthal.  The affidavit of Mr. Rogacki indicates he lived in the household during part of 1998, when the endangering charge was committed, but not the more serious charges. He could not testify to [petitioner]'s pain in June of 1999.

[petitioner] argues that his attorney should have cross examined his daughter with respect to the differences in her supporting depositions of September 23, 1999, and her grand jury testimony of November 28, 2001.  However, such cross examination tends to emphasize [petitioner]'s attempting to rape his daughter on a regular basis.  Her alleged inability to recall details of the attempted rape in the indictment could relate to the number of times her father attempted to rape her or to her confusing the first and second counts of the indictment in responding to counsel. His attorney did conduct an adequate cross examination on other matters.

Exh. P, pp.2-3.  The New York State Supreme Court, Appellate Division, Fourth

Department, denied petitioner's motion for leave to appeal Judge Euken's denial of his

motion to vacate on December 13, 2002.

***Sparman* Hearing**

Petitioner filed his petition for writ of *habeas corpus* on August 14, 2003.

Dkt. #1.  Recognizing that the Court of Appeals for the Second Circuit has held that "a

district court facing the question of constitutional ineffectiveness of counsel should,

except in highly unusual circumstances, offer the assertedly ineffective attorney an

opportunity to be heard and to present evidence, in the form of live testimony, affidavits,

or briefs," the Court conducted an evidentiary hearing on November 8, 2005, November

14, 2005 and November 22, 2005.  *Sparman v. Edwards*, 154 F.3d 51 (2d Cir. 1998).


**Raymond W. Bulson**, petitioner's trial counsel, testified that he did not

cross examine Brandy with respect to her attendance record in September of 1998

because he spoke with the principal, Barbara Funk,

> at least twice on the phone and one time in person.  And I
> asked her if she could stand by her records.  And she
> indicated that the school doesn't stand by their records.

Dkt. #23, pp.9-10, 38, 49-50.  Mr. Bulson also testified that Mrs. Funk would not agree

to testify to the fact that following the custody proceeding in February, 1999, she spoke

with Brandy and Brandy told Mrs. Funk that she had talked things over with petitioner

and Gloria and everything was alright.  Dkt. #23, p.15.  With respect to petitioner's

suggestion that Mrs. Funk could testify that Brandy's reputation for truthfulness was not

good, Mr. Bulson testified that Mrs. Funk informed him that

> she wasn't that acquainted with any of the students in the
> school to know their reputation or lack of reputation for
> truthfulness and veracity.  She told me that in dealing with
> Brandy she got the impression that she wasn't truthful or
> didn't have the appropriate demeanor.  But she said she

-31-

was unaware the other students in the school district in the
grade she was in thought that.

Dkt. #23, p.16.  Mr. Bulson explained his decision not to call Mrs. Funk as a witness as

follows:

> She was very weak.  When I say "weak," a witness can be
> very strong or very weak.  She wasn't sure of herself.  She
> didn't project authority.  She told me that she had consulted
> the records, but the records were not specific or something
> along that line.

Dkt. #23, p.53.  More specifically, Mr. Bulson recalled that Mrs. Funk stated that the

school was

> not very good at record keeping and . . . recording when the
> children arrived at the school.  They would . . . exercise their
> discretion to indicate that the child arrived in order to get
> state aid.

Dkt. #23, p.53.


Mr. Bulson agreed that it was important that the jury consider petitioner's

medical condition during the time period of the allegations, but testified  that he did not

obtain any of petitioner's medical records or consult with his doctors and did not think it

necessary to present evidence of his medical condition beyond the testimony of

petitioner and Gloria.  Dkt. #23, pp.42-46.  Mr. Bulson also opined that petitioner "didn't

act as if he was in any pain."  Dkt. #23, p.58.


When asked about Eric Rogacki, Mr. Bulson affirmed that he was aware

that Mr. Rogacki had been living with petitioner during September, 1998 and testified

that he had talked to Mr. Rogacki before the trial, when petitioner brought him to the

office, but that his

> impression of Eric was he would not be a good witness for
> us.  He was a young man.  He wasn't firm in his convictions.
> And I thought by putting him on the stand we would be
> jeopardizing whatever credibility that was evident in Gloria
> and Thomas' testimony.

Dkt. #23, pp.16-18.  Mr. Bulson testified that Mr. Rogacki did not project himself with

any degree of honesty and was not, in his opinion, sincere.  Dkt. #23, p.55.  He also

testified that Mr. Rogacki was not present in the house in June, 1999, which was the

most important time period because that was the time period relating to the charges

which would put petitioner in state prison.  Dkt. #23, p.71.


With respect to the cross-examination of Brandy, Mr. Bulson testified that

he had Brandy's grand jury testimony in his possession before he began to cross

examine her, but he could not recall whether he had a chance to review it.  Dkt. #23,

pp.23-25.  He explained that asking for time to review the grand jury testimony is

> a useless gesture in Allegany County.  You don't get it.  In
> my opinion, there should be a period of time whereby you
> get a chance to look at the Grand Jury testimony.  In other
> cases I've asked for a recess for ten minutes or for 15
> minutes to review the testimony, and it's been denied.

Dkt. #23, p.24.  He subsequently testified that he was not able to review Brandy's grand

jury testimony until the evening, after her cross examination was complete.  Dkt. #23,

pp.64-65.


**Petitioner** denied taking Eric Rogacki to Mr. Bulson's office and testified

Mr. Rogacki told him that he never spoke to Mr. Bulson prior to petitioner's conviction.

Dkt. #23, p.89.  Petitioner also testified that he provided Mr. Bulson with the name of the attorney representing him in his social security proceeding, as well as the names of the doctors he was seeing and the medication he was taking.  Dkt. #23, pp.90-91.  He testified that he advised Mr. Bulson that he had no strength in his right arm and experienced urinary incontinence.  Dkt. #23, p.91.  He showed Mr. Bulson his TENS unit for pain management.  Dkt. #23, p.92.  He denied any agreement with Mr. Bulson to forgo calling medical witnesses or to focus on the June, 1999 charge to the exclusion of the September, 1998 charge.  Dkt. #23, pp.92-93.

**Gloria Schenback** testified that she told Mr. Bulson that Mr. Rogacki resided at the house and was up every morning with her helping with the farm chores and "getting together" with Brandy "in the mornings before anybody even got out of bed."  Dkt. #23, p.95.  Ms. Schenback testified that Mr. Bulson told her that "[i]t was out of the time frame."  Dkt. #23, p.95.  Ms. Schenback stated that Mr. Bulson never talked to Eric prior to petitioner's conviction, stating, "I was in touch with Eric, and I also talked to Mr. Bulson after the trial, and gave Mr. Bulson Eric's phone number."  Dkt. #23, pp.95-96.  With respect to Mrs. Funk, Ms. Schenback testified that Mr. Bulson

> asked me to call Mrs. Funk and find out if it was all right to
> talk to her.  And when I talked to Mrs. Funk on his behalf
> Mrs. Funk said the only way she can talk with Mr. Bulson . . .
> she needed to know what he needed to know, and it had to
> go through the lawyer for the school. . . . Which Mr. Bulson
> wasn't going to do.

Dkt. #23, pp.96-97.  When asked how she knew Mr. Bulson wasn't going to contact the school's lawyer, Ms. Schenback testified that "that's what he said, and she was also out

of the time frame." Dkt. #23, p.97.  Ms. Schenback denied ever taking Mr. Rogacki to

Mr. Bulson's office.  Dkt. #23, p.97.


**Eric Rogacki** testified that he graduated from high school in June, 1998

and resided in the petitioner's home from Labor Day through Thanksgiving of 1998.

Dkt. #24, p.4.  Mr. Rogacki testified that he spoke with Mr. Bulson one time while he

was a student at the University of Rochester and that Mr. Bulson asked him if he

resided with the petitioner during 1999.  Dkt. #24, pp.4-5.  Mr. Bulson did not ask him

any questions about 1998.  Dkt. #23, p.5.  Mr. Rogacki testified that he has never

spoken with Mr. Bulson in person and has never been to Mr. Bulson's office.  Dkt. #24,

pp.3-4.


**Barbara Funk**, principal at Cuba-Rushford Central School, testified that

she never spoke with Mr. Bulson in person or on the telephone and never discussed

with him either petitioner's case or the accuracy of the school's attendance records.

Dkt. #22, pp.4-5.


## DISCUSSION AND ANALYSIS

Petitioner alleges that trial counsel was ineffective because he:

(1) failed to investigate and present evidence with
    respect to petitioner's medical history;

(2) failed to interview Brandy's boyfriend, Eric Rogacki,
    who was residing in the house in September, 1998;

(3) failed to interview Brandy's school principal,
    Barbara Funk;

(4) failed to cross-examine Brandy or present direct
evidence that Brandy was neither tardy nor absent
from school in September, 1998; and

(5) failed to cross-examine Brandy with respect to
discrepancies between her supporting deposition,
grand jury testimony and trial testimony.

Dkt. #1.  Respondent asserts that the trial court judge's denial of petitioner's motion,

pursuant to New York Criminal Procedure Law § 440, to vacate his conviction on the

ground of ineffective assistance of counsel was not an unreasonable application of

clearly established federal law as determined by the Supreme Court of the United

States.  Dkt. #29.


Exhaustion & Procedural Default

Before a federal court can address the merits of any federal issue

contained in a petition for a writ of *habeas corpus,* the petitioner must have "exhausted

the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A); *see*

*O'Sullivan v. Boerckel*, 526 U.S. 838, 843-44 (1999).  "Exhaustion of state remedies

requires presentation of the claim to the highest state court from which a decision can

be obtained." *Hogan v. Ward,* 998 F. Supp. 290, 293 (W.D.N.Y. 1998), *citing Daye v.*

*Attorney General of the State of New York,* 696 F.2d 186, 190 n.3 (2d Cir. 1982); *see*

*O'Sullivan*, 526 U.S. at 839-40 ("a state prisoner must present his claims to a state

supreme [i.e., highest] court in a petition for discretionary review in order to satisfy the

exhaustion requirement.").  In the instant case, petitioner exhausted the remedies

available in the state courts by moving to vacate his conviction pursuant to New York

Criminal Procedure Law § 440 and seeking leave to appeal the denial of that motion to

the New York State Supreme Court, Appellate Division.  *See Gersten v. Senkowski,*

426 F.3d 588, 606 (2d Cir. 2005), *cert. denied sub nom Artus v. Gersten*, __ U.S. __,

126 S.Ct. 2882 (June 12, 2006).

AEDPA Standard of Review

    Pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"),

where a state court has adjudicated the merits of a petitioner's claim, relief may not be

granted unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal
> law, as determined by the Supreme Court of the United
> States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

    The amended standard of § 2254(d)(1) requires the federal court to give

considerably more deference to the state court's legal determinations than did the pre-

AEDPA standard.  *Marcelin v. Garvin*, No. 97 CIV 2296, 1999 WL 977221, at *6

(S.D.N.Y. Oct. 26, 1999); *Tascarella v. Reynolds*, No. 97 CV 111, 1998 WL 912010, at

*1-2 (W.D.N.Y. Dec. 30, 1998).  As stated by the United States Supreme Court:

> § 2254(d)(1) places a new constraint on the power of a
> federal *habeas* court to grant a state prisoner's application
> for a writ of *habeas corpus* with respect to claims
> adjudicated on the merits in state court. . . . Under the
> "contrary to" clause, a federal *habeas* court may grant the
> writ if the state court arrives at a conclusion opposite to that
> reached by this Court on a question of law or if the state

court decides a case differently than this Court has on a set
of materially indistinguishable facts.  Under the
"unreasonable application" clause, a federal *habeas* court
may grant the writ if the state court identifies the correct
governing legal principle from this Court's decisions but
unreasonably applies that principle to the facts of the
prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J.); *see Sacco v. Cooksey*,

214 F.3d 270, 273 (2d Cir. 2000), *cert. denied*, 531 U.S. 1156 (2001).  Thus, a federal

court may only grant *habeas* relief where the state court's application of clearly

established federal law was not only erroneous, but objectively unreasonable.  *Williams*,

529 U.S. at 409; *see Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We cannot

grant relief under AEDPA by conducting our own independent inquiry into whether the

state court was correct as a *de novo* matter.").  Although the Court of Appeals has

concluded that an objectively unreasonable application of Supreme Court precedent

requires some increment of incorrectness beyond error, that increment need not be

great because "otherwise, habeas relief would be limited to state court decisions so far

off the mark as to suggest judicial incompetence."  *Francis S. v. Stone*, 221 F.3d 100,

111 (2d Cir. 2000).


Ineffective Assistance of Counsel

        The relevant federal law with respect to a claim of ineffective assistance of

trial counsel is the performance and prejudice test established in *Strickland v.

Washington,* 466 U.S. 668 (1984).  Petitioner carries a heavy burden in establishing

that the state court's decision was contrary to *Strickland.  United States v. Gaskin*, 364

F.3d 438, 468 (2d Cir. 2004).  As explained by the Second Circuit Court of Appeals in

*Pavel v. Hollins*:

> To establish that he was convicted in violation of his right to effective assistance of counsel, a claimant must satisfy both prongs of the two part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test is "rigorous," *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), and "highly demanding," *Kimmelman v. Morrison*, 477 U.S. 365, 382, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To satisfy it, a claimant must show both that "counsel's performance was deficient" *and* "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.
>
> As to the first prong, to determine whether an attorney's conduct was deficient, "[t]he court must. . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the *wide* range of professionally competent assistance." *Id*. at 690, 104 S.Ct. 2052 (emphasis added). As to the second prong, to establish that he was "prejudiced" by his attorney's constitutionally deficient performance, a claimant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S.Ct. 2052. A "reasonable probability" in this context is one that "undermine[s] confidence in the outcome." *Id*.

261 F.3d 210, 216 (2d Cir. 2001). In evaluating prejudice, the court considers "the cumulative effect of all of counsel's unprofessional errors." *Gersten*, 426 F.3d at 611; *Lindstadt*, 239 F.3d at 204. The court also considers the cumulative weight of the evidence presented at trial, understanding that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors." *Id.*, quoting *Strickland*, 466 U.S. at 696.

The Court of Appeals for the Second Circuit has "underscored the importance of effective representation for defendants in child abuse prosecutions," noting that

> With third-party witnesses often unavailable, these cases
> frequently hinge on judgments about credibility in which
> jurors must choose between contradictory stories proffered
> by the defendant and the complainants.  Just as the
> complainants are entitled to effective advocacy, so too are
> those charged, especially given the consequences of
> conviction.  Thus, we have underscored the importance of
> effective representation for defendants in child sexual abuse
> prosecutions.  *See generally Pavel v. Hollins*, 261 F.3d 210
> (2d Cir. 2001); *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir.
> 2001).  The teaching of the law in this Circuit is that defense
> counsel is obliged, whenever possible, to elucidate any
> inconsistencies in the complainant's testimony, protect the
> [petitioner]'s credibility, and attack vigorously the reliability of
> any physical evidence of sexual contact between the
> [petitioner] and the complainant.

*Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003).  Errors or omissions which "cannot

be explained convincingly as resulting from a sound trial strategy, but instead arose

from oversight, carelessness, ineptitude, or laziness," demonstrate "quality of

representation sufficiently deficient to grant the writ." *Id.*

As Judge Euken recognized in his decision denying petitioner's motion to

vacate, "[t]he critical issue in the case for the jury to resolve was whether [petitioner's]

seventeen year old daughter was telling the truth."  Exh. P, p.2.  However, the

cumulative effect of trial counsel's numerous errors of both trial technique and

professional conduct seriously undermines this Court's confidence in the jury's ability to

make that determination.

Of greatest concern to the court is trial counsel's failure to cross examine

Brandy regarding significant discrepancies between her grand jury testimony and her

trial testimony.  For example, before the grand jury, Brandy testified that during the

June, 1999 incident, "she was screaming and then Gloria came up, but she didn't do anything, she told me to get ready for school." Exh. O, pp.22-23. At trial, Brandy testified that she managed to get herself out from under petitioner and ran downstairs naked but no one else was in the house. Exh. R, pp. 82-86. Instead of impeaching Brandy regarding this inconsistency, trial counsel permitted her to refresh her recollection. Exh. R, pp.173-74. Moreover, trial counsel asked no questions concerning the contradiction of Brandy's grand jury testimony that she still had her pajamas on during this incident and her trial testimony that petitioner took her pajamas off. Exh. O, p.22; Exh. R, p.85. Similarly, trial counsel did not note that Brandy's supporting deposition regarding the June, 1999 incident indicated that petitioner "laid on top" of her; her grand jury testimony indicated that petitioner "pushed [her] down on [her] chest" and "grabbed [her] and held [her] down;" and her trial testimony was that petitioner "got on top of [her] and "was laying on top of [her]." Exh. O; Exh. O, pp.22-23; Exh. R, pp.83 & 85.

Trial counsel attempted to explain his failure to cross examine Brandy by suggesting that he did not have time to review the grand jury testimony before questioning her. Dkt. #23, pp.23-25 & 64-65. However, the trial transcript reveals that the court recessed for approximately 12 minutes during the middle of trial counsel's cross examination of Brandy. Exh. R, p.131. Trial counsel's questioning with respect to the allegations in the indictment followed this recess. Exh. R, pp.148-74. Trial counsel's use of the grand jury testimony to refresh Brandy's recollection as to the events of June, 1999 suggests that he was aware of the inconsistency but lacked the skill to properly impeach the witness on this important discrepancy.

Judge Euken's determination that such cross examination would "emphasize [petitioner]'s attempting to rape his daughter on a regular basis" and his suggestion that Brandy's "inability to recall details of the attempted rape in the indictment could relate to the number of times her father attempted to rape her or to her confusing the first and second counts in the indictment in responding to counsel" ignores the Court's prior decision refusing to allow Brandy to testify as to a continuing course of sexual, physical and verbal abuse by her father because of its concern that "[s]uch testimony has the serious potential to result in a conviction based on a desire to punish the [petitioner] for his past conduct rather than convict him on the strength of the evidence against him for the crimes he was indicted." Exh. P, p.3.

Despite conceding possession of school attendance records indicating Brandy's only absence in September, 1998 was for BOCES, trial counsel also failed to impeach Brandy regarding her trial testimony that during September, 1998, she would sometimes miss the bus and stay home because of petitioner's abuse. Exh O &. R, pp.73-78. Mr. Bulson's testimony that he did not want to bring Brandy's partial absence to the attention of the jury suggests that he failed to adequately investigate the nature of this absence, lending credence to Mrs. Funk's assertion that she never spoke to Mr. Bulson. Dkt. #23, p.54.

Mr. Bulson also failed to impeach Brandy regarding her testimony that Gloria and Jason were the only other members of the household during September, 1998. Exh. R, pp.73-78, 149-50, 176. The Court finds it difficult to understand why Mr. Bulson would confirm Brandy's testimony that Jason was the only other male in the

household during this time frame and then fail to question her about Mr. Rogacki's presence in the house during this time period.

Judge Euken did not address trial counsel's failure to call Barbara Funk and Eric Rogacki as witnesses, except to note that Mr. Rogacki's affidavit "indicates he lived in the household during part of 1998, when the endangering charge was committed, but not the more serious charges." Exh. P, p.2. It is common sense, however, that the jury's assessment of Brandy's credibility with respect to the allegations of September, 1998 would affect their assessment of her credibility with respect to the allegations of June, 1999.

Having had the opportunity to hear the testimony of Barbara Funk and Eric Rogacki during the *Sparman* hearing, the Court finds it difficult to comprehend trial counsel's assessment of Mrs. Funk as weak and Mr. Rogacki as less credible than petitioner and his girlfriend. However, even if trial counsel had legitimate reasons for preferring not to call these disinterested individuals as witnesses, his failure to impeach Brandy with the information Mr. Bulson claims to have obtained from them is inexcusable. Thus, the Court need not make a determination as to the veracity of trial counsel's testimony regarding his contact with Mrs. Funk and Mr. Rogacki in order to find his representation of petitioner constitutionally deficient.

The Court is equally concerned with Mr. Bulson's admitted failure to investigate petitioner's medical condition and his apparent failure to discern the

potential value of evidence of petitioner's back injury.  Dkt. #23, pp.42-46.  Although

"strategic choices made after thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable,"

> counsel has a duty to make reasonable investigations or to
> make a reasonable decision that makes particular
> investigations unnecessary.  In any ineffectiveness case a
> particular decision not to investigate must be directly
> assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's
> judgments.

*Strickland*, 466 U.S. at 690-91.  Thus, the constitutional issue is not whether an

individual with erectile dysfunction or a back injury could commit attempted rape, but

whether trial counsel's failure to investigate petitioner's medical condition so as to be in

a position to make a knowledgeable determination as to the most appropriate strategy

in defense of his client, can be countenanced.


At the *Sparman* hearing, petitioner's trial counsel testified that he decided

not to investigate petitioner's medical condition based on nothing more than his own

assessment that petitioner didn't act as if he was in any pain, so the jury would think he

was lying.  Dkt. #23, p.59.  As a result of this subjective assessment, Mr. Bulson did not

consult with any of petitioner's medical providers and the jury heard no medical

evidence of petitioner's significant limitations in lumbar and cervical mobility and

reported weakness in his right arm during September, 1998 or his cervical discectomy

with fusion on April 13, 1999 and subsequent recuperation or continued lumbar

symptoms.  Such testimony may well have been important to the jury in considering

Brandy's testimony that petitioner slapped her, threw her on her bed, laid on top of her and took her clothes off as she pushed and struggled against him.

Instead of presenting such potentially relevant information, Mr. Bulson suggested in his opening statement that petitioner "couldn't even rise to the occasion," as part of his trial strategy of "throw[ing] it out there for anybody who wanted to grab hold of it," but then argued to the jury that they were "not here to determine whether or not [petitioner is hurt or was hurt because he's the only person who said he was." Exh. R, pp.53-55; Exh. U, pp.9; Dkt. #23, pp.58-59.  In response, the prosecution emphasized petitioner's failure to present medical evidence to support their claim of physical inability to commit the crime.  Exh. U, p.75.

This is not the only instance where the performance of petitioner's trial counsel undermined petitioner's defense strategy.  For example, although Mr. Bulson advised the jury that the proof would demonstrate that petitioner "does not get up early in the morning" and petitioner testified that he normally awoke about 9:00 a.m., Mr. Bulson elicited testimony from Jessica Sullivan that she observed petitioner downstairs at 7:10 a.m. "most of the time" when she arrived at the petitioner's home to catch the school bus.  Exh. S, pp.154-55; Exh. T, pp.21-23.  Similarly, as part of his theory that Brandy was being manipulated by her mother, Laurie Howard, Mr. Bulson suggested to the jury during his summation that

> When Brandy was testifying on direct examination her eyes
> were focused out there to her mother, but when I cross
> examined her and stood here, she had problems. Even the

-45-

> simplest question was a problem when I blocked the line of
> sight . . . but when I moved . . . so I wasn't blocking the line
> of sight, she could look out there and get telltale cues.  And I
> would suggest to you . . . that's very telltale as to whose
> agenda we're working on in this courtroom and have been
> working on in this courtroom since the beginning.

Exh. U, p.44.  The prosecution subsequently reminded the jury that Mr. Bulson had

successfully argued, in their presence, to have Brandy's mother excluded from the

courtroom.  Exh. R, p.9 & Exh. U, p.77.


This case hinged upon the jury's character assessment of two individuals:

the petitioner and his daughter.  Although trial counsel characterized Brandy as

conniving, manipulative and motivated to find a way to be with her boyfriend, he did not

undermine her credibility with evidence of significant discrepancies in her testimony, *to

wit*, inconsistent statements regarding circumstances of abuse, claimed absences from

school and omission of Eric Rogacki as a resident in the house during September,

1998.  Because he failed to investigate petitioner's medical condition, trial counsel was

unable to make a strategic decision as to the appropriateness of a medical defense or

to effectively present the medical issues to the jury.  Instead, trial counsel elicited

testimony of erectile dysfunction and pain from petitioner and his girlfriend before

conceding to the jury that petitioner's medical condition was not an issue because

petitioner's testimony on the subject was the only evidence before the jury.  Petitioner's

trial counsel further undermined his client's credibility by, *inter alia*, highlighting

numerous prior investigations by Child Protective Services and calling Jessica Sullivan

to testify in contradiction to the testimony of petitioner and his girlfriend with respect to

his morning schedule.  When balanced against the underwhelming evidence of

petitioner's guilt, these deficiencies in trial counsel's performance seriously undermine

the Court 's confidence in the outcome of this proceeding.  As a result, the Court

concludes that the judgment of conviction was entered in violation of petitioner's right to

effective assistance of counsel as set forth in the Sixth Amendment to the United States

Constitution.


## CONCLUSION

Based on the foregoing, the petition for writ of *habeas corpus* is

conditionally **GRANTED** unless the People of the State of New York commence new

state criminal proceedings against petitioner within sixty days of this Decision and

Order.


**SO ORDERED.**


DATED:      Buffalo, New York
            December 14, 2006


**S/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**